I don't think you're going to have time to use all those documents. You have to come up here or it won't get recorded. I'm running to general on behalf of Randall Chang. And I'd like to take 15 minutes of our time. Five minutes. Yes. Keep track of your own time. Yes, please. This is a case that is substantially documented. And I'd like to start out with the fact that this case is a very celebrated institution. I'm sure the panel has heard of it. It probably was in headlines for two years during this time period. And it starts basically with the Internal Revenue and the courts wanting to take micromanagement away from the trustees. So in 1999, they removed existing trustees with a stipulated approval by the IRS and state courts. And this is the governance process, which is a part of our record. And I read you just one line from it. And this was the whole purpose, again, I bring to your attention. To take micromanagement away from the five trustees and put it in the hands of the CEO. It's to avoid politics and all the things that occur. Five, six billion dollars, Michigan State. And I read you one sentence from the governance process. The board sets policy. Management implements policy. The board is responsible for oversight of the estate. And this is the key. This whole case, I believe. While the day-to-day management of the operations of the state is the responsibility of the chief executive officer. In this case, the fellow McCovern. On summary judgment, the district court, we believe, overlooked the existing law and put a stamp of approval that the trustees selected a CEO and reorganized the estate when this was the duty and responsibility of the CEO. Well, that argument sounds more like it should be addressed to the court that removed the trustees and ordered a new system. The only question here is whether the failure to continue the employment of your clients was because of race. We did make that argument, Your Honor. But the court found, number one, that the reorganization, this is critical, was a responsibility of the trustees and not of the CEO. Now, I have actual testimony, which is in the transcript of Mr. Kihune, that states this is something for the CEO. We're putting everything on hold till he comes aboard. Mr. Chang was here, approached him. Should we start? No, we're putting everything on hold till he gets here. Under the pretext of reorganization, which is set out in the governance policy, they fired and terminated Chang. Now, what's the proof of that? Number one, Your Honor, reorganization, in this reorganization, these are undisputed facts. Number one, Chang was the most senior executive officer in Bishop's estate. He oversaw the entire five, six billion dollar estate, everything. Chang had never received a single derogatory letter since the day he was hired by the former trustees who were ousted by the court. Not one. Number two, he had never been criticized that his work, his competency, his integrity, his honesty was even an issue. Number three, Chang was the only executive to be fired under reorganization. Nobody else was fired. Number four, the CEO was hired and announced to the school on January 2nd, 99, and these times are important, Members of this Court, because under this governance policy, the new interim trustees took office May 1, 99. From May 1, 99, that the interim trustees took office, to January 25, 2000, Chang was fired. In a span of six months, six months, that's a time frame, January 2nd, the new CEO, McCubbin, who was to appoint and select the senior executives, the CIO, the CFO, whoever you want. It's in here. It's in our opening brief. He was hired January 2nd. He was to take office February 1st. Chang met with him. McCubbin's testimony is in our brief. It's in the summary judgment opposition. I was impressed. We have a place for this man, the man who was a key executive now overseeing real estate and finances. Undisputed in 99 and 2000, in a hundred years of the Bishop estate that oversaw the children of Hawaii, the school, the administration, undisputed under Chang, even though the market did go up, never before had the estate ever earned over one billion under Chang, over one billion in stock, securities, and finances, Goldman Sachs, you name it. Undisputed under Chang, he produced a term of 9-1-1, the Hawaii Core Assets Plan Program, approved by the board, and used and adopted by Mr. Brooks when he took office. This is what he did under Mr. Brooks of Hawaii's all-American government under Chang. Chang had never been criticized that he did not understand real estate and you don't know land. Next undisputed fact. The first thing Chang did when he took office was tell the chairman of the board, a graduate of Kamehameha, an honorable man, a former admiral, Kihuni, we need to straighten out the favoritism over Hawaiians and part Hawaiians and Kamehameha graduates. That's undisputed. It's nowhere in the disputed facts. He told AIPA that. We need to pick the meritorious people, even though we need to keep a balance. And it is a Hawaiian institution we're overseeing, but this is the administration to oversee over five billion in assets. Undisputed. What happens? In the span of May 1 to December, five months, six months, number one, the most important man, senior executive, overseeing five billion, members of the SPARC, and you said this in, this SPARC said in Ray versus Henderson, putting him in a dingy closet, cutting off challenging assignments, hostile work environment. Page 1241. But what you described so far is a pretty good wrongful termination case. What is your specific evidence of the pretext that there is a discriminatory animus? Number one, this court has held that we violate your own hiring policies. Every senior executive, as far as I know, Chang, McCubbin, McCubbin's people, went through a screening process, they went through coin ferry, they were selected, and the best were picked. In this case, Mr. Brooks, right down the street, Pacific Club. December, we've got a job for you. Three meetings later, he's hired. That was it. He didn't even put an application in. They wrote up his qualifications for real estate in February after he took office. Now, here's the point I made. Members of this court, there is nothing in this governance policy that eliminates Chang's position. There is nothing that says the CIO will have to be heavy in real estate. And if you were to compare, which is in the record, Chang's qualifications and his performance required, and the one they drew up for Brooks after he was hired, the only difference, when you read all the fine lines, is that they put in there, Brooks, for his position, you must have over ten years' experience in real estate. In Chang's case, he had real estate and finance. But here's a significant point. They also put down that you've got to be a BA. Brooks didn't even finish college. Chang's got a PhD. Number two, there's nowhere in here that says in the reorganization that the bishop doesn't. In fact, here's what the trustees did. After they hired Brooks as a pretext for reorganization, they went to the state court, which requires their approval. And in the excerpt 24, they said, and this was in September, no less, 2000, line seven, consultation with CEO McCubbin. Petitioners have concluded adjustment of subordinate positions, and they go on to say, namely a CIO, six, five, six months later. Then they ask the court, and we have it in our briefs, give us carte blanche approval that we can do this on our own. The court says, I think this is definitely vague. You may not. Everything requires my approval to prevent this micromanagement that occurred. They did not have the right to reorganize. Absolutely not. Let me move on. The court rubber-stamped and said they did. The court rubber-stamped and said they had a right to put real estate as an imposition. There's nothing in a governance policy that allows them to pick the CIO. Retaliation. This was in our second amendment claim. The man who never had a criticism earned over a billion. Even IPA. Competent man of integrity never stole on the 25th. Chang, you got 48 hours to get out. Monopoly. Go and don't stop. Give us your parking pass, your credit card, and come back Saturday morning, and we will oversee you when you clean your desk, which they did. Two people watched him. A common thief. You want to talk about putting a man in a dingy closet? And he did nothing wrong. Retaliation. And all he did was tell them, Neil Hannes, my supervisor, called Ramos a token Howley. Don't do that. I'm from the bank. I'm CEO. We're equal opportunity. You can't do that. IPA, who was put over him, a legal counsel. Chang, you take race too seriously. What about the law about counseling people and stopping this activity? Salvador, no job for her. We've eliminated President Chang. Chairman, create a position for her. She's Hawaiian. She's been with us a long time. Find one. Chang, human resources assistant. This is what I mean about favoritism. We can't run the administration like this. Chang, Peterson's a good, forgive the word, Howley. He's smart. We need to move him up to land manager. Chang, he didn't go to Kamehameha. You don't understand. He doesn't understand Hawaiian values. Chang, the man in charge of five billion, appoints the money managers. In six months, Chang, you don't need to meet with them anymore. IPA, a legal counsel. No training. I'll meet with them. You stay home. What about the trustees go to neighbor island to show the assets? Chang, you're not needed anymore. We don't need you. My supporter next. Chang, we'll meet with your supporter. Chairman, you've got four minutes for rebuttal. Thank you. Last point. We didn't file an EEOC claim. I've read all the decisions, by your honor. SOSA, all of them. I just leave this one with you. In, if you look at the EEOC claim we filed. Checked off. Retaliation, opposed discrimination. Who did it? IPA, reorganization resulting in position elimination. Last page, harassment, hostile work, retaliation, racial discrimination, violation section 378-2, constitution and state law prohibiting discrimination because of race. The court said, Mr. R, you have no jurisdiction. I have no jurisdiction on this case. It wasn't properly filed. I leave that with you. I've read all your cases. The liberal attitude, even where the officer makes a mistake. I've read them all. Thank you, sir. Thank you, counsel. Good morning, your honors. May it please the court, my name is Robert Katz and with my associate Clayton Kamita, we represent the appellants. Your honors, May of 1999 marked something of a culmination of a traumatic year for the Maine Bay School's Bishop Estate. The state had been under some pressure from both the courts and the IRS to reorganize and to change the operations of the estate. That didn't happen quickly enough. The probate court stepped in and appointed interim trustees to get that job done. Now, one of the things the interim trustees decided that needed to be done was to reorganize the way in which the assets of the estate were managed. It decided to outsource all the liquid assets and to focus the attention of the estate on the development and management of its real estate assets. To do that, the trustees decided that they needed to have someone overseeing that process, but actual experience in the development and management of real estate assets. There's no dispute that the trustees made those decisions, and there's no dispute that Mr. Chang conceded in his deposition that he did not have any experience in the development or management of real estate assets. The trustees determined to hire someone who had that experience, and they found someone who had almost 40 years of experience. They made that decision to hire this person who had the experience. Unfortunately, that meant there was not a position for Mr. Chang. Now, Mr. Chang, counsel tells you that that decision was really based on discrimination because of his race. The problem, Your Honor, is that there was never any evidence to show that there was discrimination based on race here, and there's no evidence, certainly, to show that the reasons asserted by the trustees for their decisions to reorganize the management of their assets or to select someone to oversee that process who had the experience was a pretextual decision to mask some discrimination against persons of Japanese ancestry, such as Mr. Chang. In fact, Helen's counsel told you this morning that his client emphasized to the trustees, to the new interim trustees, that their hiring decisions should be based on merit and not on favoritism for Hawaiians or part Hawaiians. In fact, that's exactly what they did in making the decision to hire Mr. Brooks as their chief investment officer. They looked at who was the most qualified for that position, and that's who they hired. Now, in order to try and establish pretext in response to your questions, counsel gave you a few reasons. First, he said, well, the way in which they hired Mr. Brooks violated the estate's own hiring policy. And he mentioned the fact that Mr. Brooks did not fill out an employment application until after he was hired. Your Honors, that was exactly the same process that the trustees had always followed. It was exactly the same process they followed when they hired Mr. Chang in 1998. The trustees did their own interviewing. They made the decision. They offered the job. And then in Mr. Chang's case, after that, he filled out an employment application. The testimony from the Human Resources Department in this case established that that had always been the path of the trustees. When it came to hiring senior management officials, the trustees always did it themselves. They did not go through the Human Resources Department. The other argument made by McClellan in this appeal is that the district court erred by assuming that the trustees had the authority to reorganize the estate and to reorganize the way assets were managed by the estate. I think Your Honors' first response to that is clearly the correct one, and that is if there really was an error by the trustees in reorganizing, that's a question that should have been brought to the probate court. In fact, when the trustees did go to the probate court to inform the probate court about the changes they had made in their government's policy, the probate court's decision, which is part of the record here, specifically said they didn't have to come to the probate court for approval because they had the authority to do what they did anyway. The governance model that McClellan relies on clearly was not a policy set in stone. Both the policy manual itself and the probate court's decision approving the changes made by the trustees clearly says that this is an involving organizational and that the trustees were charged by the probate court with heading up that evolution in the management and operation of commandment schools. So I think, Your Honors, that the district court probably properly granted somebody judgment on the disparate treatment claims. On the retaliation claim, Your Honors, the court below decided again properly that there was no timely retaliation claim. McClellan this morning has disputed that contention, but the undisputable facts are as follows. The actual charge filed with the Civil Rights Commission and the EOC does not indicate retaliation as a claim being made. This court has ruled that the lack of a reference to retaliation in the charge may not be dispositive if the reason that that retaliation is not indicated in the charge was because of some negligence by the Civil Rights Commission and the EOC in putting together the charge. At all times during the administrative proceedings, the appellant was represented by counsel. If you look at the pre-complaint questionnaire that was submitted in support of a claim of retaliation, the only thing it references is Mr. Chang's claim that he was retaliated against by the interim trustees because he testified in a probate court hearing in favor of the former trustees. The Civil Rights Commission properly told Mr. Chang's attorney, Mr. Chang, that that was not a basis for a Title VII claim. It's not the kind of protected activity protected by a Title VII claim. When the appellant filed his original complaint in this case long after the time had passed for filing a timely claim with the Civil Rights Commission, the only claim of retaliation in the original complaint filed in this case was also based solely on in favor of the former trustees. This whole notion about retaliation because of complaints about favoritism for Hawaiians didn't even emerge until the First Amendment complaint in this case. There's no way that anyone logically could have looked at the charge filed in this case, which had made no mention of retaliation, or looked at the pre-complaint questionnaire in this case, which makes no mention about opposition to favoritism for Hawaiians, and conclude that the appellant was ever alleging a timely alleging claim for retaliation based on opposition to so-called favoritism for Hawaiians. Well, Mr. Brooks self-identifies as a Caucasian. Yes, that's correct. I take it, looking at the record, I don't think it says that he's not a graduate of command. He's not. He grew up in Los Angeles.  His mother was Polynesian. Is that conceivable? His grandmother. Yes, I believe it came out in his deposition that his grandmother was Polynesian, although we don't know what that mix was. Polynesian is a generic term for a variety of races, but he himself made it very emphatic in his deposition. He doesn't consider himself anything other than Caucasian, and he was not a graduate of command in these cases. Your Honors, I know there's also other claims that were raised in proceedings below and there was a claim of promissory estoppel, but it was not addressed in the reply brief. I don't know if the Court has any questions about that issue. If not, I think we've covered it pretty thoroughly in the briefs. I would like to, if possible, reserve a minute of my time for any further rebuttal. No, there's no further rebuttal. Okay. Okay. Thank you, Your Honors. Thank you, Judge. Thank you. It's undisputed that the trial court dismissed Chang on the reorganization on the basis that the trustees had a right to reorganize and Chang was not qualified because he didn't have Brooke's real estate experience. One and two in that order. Number one, it's undisputed that nowhere in the state court's governance policy that oversaw it ever said, ever said that the trustees have a right to organize, reorganize. Never. Number two, he wouldn't even admit it in his deposition. That's the CEO's job. Number three, as to qualifications, please note this goes to retaliation. Chang, with his multitude of experience, certainly had a new job or they'd create one for him under McCubbin or whoever and let him apply for one. They took him out the door one week before McCubbin. You know what's ludicrous about this? Ludicrous. You got over two and a half billion in stocks and securities that gyrate every day on exchange. The company was naked for over a week because there was nobody with his ability and experience to oversee it. It's in our motion for SJ in response. Brooks' knowledge of stocks and securities was limited to his personal portfolio, and the company let the total company with almost three billion in this kind of assets for one week, Chang, collect your belongings out the door. Nobody was even watching the store. Money managers, we've seen what they can do and what they can't do. Next point. This part in Washington v. Garrett, cited from Lozier v. Interstate, says, essentially, I won't read the whole quote, the term reorganization is not a magic word whose incantation can justify use of brief actions to circumvent an employee's procedural rights. Villareno v. Aloa Air Service, forgive me, in terms of dishonesty of the employer believing they had the right to do this, he only said in his deposition they couldn't do it. So how do you believe they had the honest right to do what they did? And he's the only one, mind you, that got terminated in the so-called reorganization. Nobody else. They didn't even keep him to give him another job. They gave one to IPA when they didn't have a job. He was special assistant to the CEO. They gave one to this other fellow. He was special whatever until we find him a job. Chang, one week till McCubbin comes in, out the door, finally on this issue of the form. Here it is. If that's not clear that he's claiming racial discrimination, then what is? No, the question was he's claiming retaliation. Yes, sir. Because of his comments about the racial composition of the workforce. Retaliation opposed discrimination. Checkbox. Court said he didn't check it. Last page, part of the form. Retaliatory termination, racial discrimination. Next line. HRS 378-2. That statute imposes vicarious liability. Hawaiian state constitution prohibiting discrimination because of race. Now, I admit we didn't write a brief. But if that's not clear, what do you have to do to file an EEOC Hawaii civil rights complaint? I leave this last point with you. Promissory stuff. The fellow who wrote the declaration, Richard Wong, which you have, this fellow hired him, he was on the front page for I don't know how many weeks and months. He was the man who hired him, and he was the man who said they want him out. He's out. He's the guy who Chang went to testify when he got subpoenaed in Maine. That they did an excellent job, made us a lot of money. I leave you with this one point. Hawaii law recognizes promissory stuff. Restate in the contract section 90. We have cases on that point. The point I make is this. We have one claim here, and I'll end here. We asked for exact minutes when he was hired. We got nothing. We asked for exact minutes when Chang got that land program approved to show what they said about him because nobody complained they adopted it. We got zero. The court said, unless you can point to me what and what happened in the exact minute, order whatever, you don't get it. We're not giving it to him proprietary. We signed an agreement. Whatever we get, at the end of the case, we give it all back to you. Not published, et cetera. Now, I thought the federal rules allowed liberal discovery. We got nothing. We made copies of the redacted executive minutes. All they gave us was when he was fired and when Brooks was hired. Why? Because the point being, when he was hired and the chairman who wrote this down, what did they say in the meeting? What did they say in the meeting? When they approved that land program, did they commend Chang? Is that bad that we shouldn't see this? I leave this thought with you, and I'm done. Members of this court, there is something you have before you that allows the trustees to reorganize. The court said they could do that. There is nothing in the governance policy that allows them to pick one executive only, the CIO. Nothing. And there's nothing in there that says from now on he has to be more versed in real estate. And finally, retaliation. A man of his ability that earns $1 billion for you, no complaints, and he's out the door one week before McCubbin comes in. Inference, real, substantial, absolutely. I think we were entitled to get past at least summary judgment. We more than established the prima facie case. And finally, I noted, I don't know if you got it, I noted the Rotter case, the Lyon case, the Senate to the 9th, and that case I think is right on point about summary judgment motions. Thank you very much for your patience. Thank you, Kenneth. Thank you both very much. The case, it's argued, will be submitted. The court will take a brief recess.
judges: Browning, Reinhardt, Thomas